## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Nicholas Pitzer, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the accounts.

2. I am a Special Agent employed by the United States Department of Justice, the Federal Bureau of Investigation (hereinafter "FBI"), and as such I am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C) and am authorized to apply for federal search warrants. I am a Special Agent of the Federal Bureau of Investigation and have been so employed since April 2022. I am currently assigned to the FBI Resident Agency in Huntington, West Virginia. I completed five months of training at the FBI Academy in Quantico, Virginia, where I learned the skills necessary to conduct federal criminal investigations, including investigating crime scenes, interviewing witnesses and suspects, and writing reports and affidavits. I have experience investigating complex drug trafficking organizations, firearm violations, and child exploitation, as well as other violations of federal law. Prior to working for the FBI, I was employed as a police officer in the State of Ohio for

seven years. During that time, I was employed with the City of Marion and the City of Upper Arlington.

3. During my tenure with the FBI, I have participated in numerous investigations during the course of which I have (a) conducted physical and wire surveillance; (b) executed search warrants at target locations; (c) reviewed and analyzed numerous taped conversations and records; (d) debriefed cooperating subjects and victims; (e) monitored wiretapped conversations of criminal activity and reviewed line sheets prepared by wiretap monitors; and (f) conducted surveillance of individuals engaged in criminal activity. Through my training, education, and experience, I have become familiar with (a) the way illegal child pornography is imported and distributed; (b) the methods of "payment" for such child pornography; and (c) the efforts of persons involved in such activity to avoid detection by law enforcement.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1470, 2422(b), and 2252A have been committed by "JIMMY SMITH," "MARK JHON," and other subjects that are unknown at this time. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## PROBABLE CAUSE

6. In July of 2023, Jessica Littrell, a Licensed Professional Counselor at Cincinnati Children's Hospital, reported to the FBI that a minor female victim whose identity is known to investigators but who shall be referred to herein as "Minor Victim 1" ("MV1"), had participated in "inappropriate" online activities, which included being sent nude photographs from individuals through social media. It was further reported that MV1 sent the same individuals nude photographs of herself. In July of 2023, MV1 was fifteen (15) years old and living in Kenova, Wayne County, West Virginia.

7. On August 31, 2023, MV1 participated in a Child Adolescent Forensic Interview at Cabell-Huntington Hospital in Huntington, Cabell County, West Virginia. During the interview, MV1 stated that she created a "fake" Facebook profile under the username "Macie Mays" and used the profile to communicate with unknown individuals through Facebook Messenger. MV1 did not say when she created the "Macie Mays" profile. MV1, through the "Macie Mays" profile, received and accepted numerous friend requests from individuals she did not know. She used Facebook Messenger to talk to those individuals through text messaging and video calls.

8. In or around July 2023, MV1 received nude photographs from two individuals, "Jimmy Smith" and "Mark Jhon." At "Jimmy Smith's" request, MV1 sent "Jimmy Smith" an unclothed, nude photograph of her buttock. On a separate occasion, she sent "Jimmy Smith" an unclothed, full-frontal nude photograph that showed her pubic area, breast area, and face. After "Jimmy Smith" received the full-frontal nude photograph from MV1, "Jimmy Smith" asked MV1 to not send any more photographs that showed her face. MV1 then proceeded to block "Jimmy Smith" from contacting her via Facebook Messenger. She also blocked contact with

"Mark Jhon" after she received several unwanted nude photographs from "Mark Jhon." Prior to blocking both accounts, MV1 engaged in consensual video chats with "Jimmy Smith" and "Mark Jhon." During the video chats, MV1 did not observe the faces of either "Mark Jhon" or "Jimmy Smith." On one occasion in or around July 2023, "Jimmy Smith" showed MV1 his genitals and started to masturbate on the video call.

9.  MV1 provided consent to investigators to review her "Macie Mays" Facebook profile and her Facebook Messenger account. Investigators confirmed that MV1's "Macie Mays" Facebook profile information displayed a date of birth indicating that "Macie Mays" was a minor. All Facebook "Friends" of "Macie Mays" were able to publicly see her date of birth. MV1 could not remember if she provided her age during her Facebook Messenger text chats or video calls with "Jimmy Smith" and "Mark Jhon."

10. Investigators also reviewed MV1's Facebook Messenger conversations and located the conversation with "Mark Jhon." At the time of review, "Mark Jhon's" profile was blocked; however, investigators reviewed prior messages between MV1 and "Mark Jhon" that had not been deleted. In or around July 2023, "Mark Jhon" sent MV1 several video call requests as well as several nude photographs and pornographic videos. MV1 did not respond to any of "Mark Jhon's" messages. Investigators were not able to locate conversations between MV1 and "Jimmy Smith." MV1 later told investigators that she had deleted several conversations she had with "Jimmy Smith" and "Mark Jhon" shortly after she blocked their profiles. Those deleted conversations were not able to be recovered from MV1's Facebook account. However, investigators sent Meta a preservation request on January 2, 2024, for MV1's Facebook account.

## BACKGROUND CONCERNING FACEBOOK[1]

11. Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

12. Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

13. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

---

[1] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

14. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

15. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

16. Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

17. Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content

unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

18. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

19. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

20. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

21. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

22. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

23. In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

24. Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

25. Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

26. Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

27. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a

residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

28.  Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

29. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

30. Based on the foregoing, I request that the Court issue the proposed search warrant.

31. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

32. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

Respectfully submitted,

*/s/ N.P. Pitzer*

Nicholas Pitzer, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 22nd day of April, 2024.

HONORABLE CHERYL A. EIFERT
UNITED STATES MAGISTRATE JUDGE